## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | | |
|---|---|---|
| Dianne M. Maros, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| Vs. | ) | **Jury Trial Demanded** |
| | ) | |
| Ashley Elizabeth Cure, | ) | |
| Greenville County, and | ) | |
| Greenville County Sheriff's Office, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, by and through her undersigned attorneys, brings this Complaint against the Defendants and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Dianne M. Maros is a citizen and resident of Greenville County, South Carolina.

2.     Upon information and belief, Defendant Ashley Elizabeth Cure is a citizen and resident of Greenville County, South Carolina.

3.     At all times relevant hereto Cure was acting under the color of state law in her capacity as a deputy with the Greenville County Sheriff's Office ("GCSO").

4.     Greenville County and the Greenville County Sheriff's Office (collectively "employing Defendants") are governmental entities or political subdivisions of the State of South Carolina as defined within S.C. Code Ann. §§ 15-78-10, et seq.

5.     The matter is an action for money damages brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Dianne M. Maros's clearly established rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution against

Defendant Ashley Elizabeth Cure in her capacity as a duly-certified law enforcement deputy employed by the Greenville County Sheriff's Office for her violations of Maros's constitutional rights, and the employing Defendants for their unconstitutional policies, customs and/or practices under *Monell* and its progeny.

6.      The acts and omissions complained of herein are actionable pursuant to 42 U.S.C. § 1983 and 1988.  As a result, this court has original jurisdiction pursuant to 28 U.S.C. §1331 and §1343.

7.      Additionally, the employing Defendants are responsible for the actions of all of their respective officers, agents, and employees (hereinafter "employee" or "employees"), and are sued in their respective representative capacities pursuant to the South Carolina Tort Claims Act, S.C. Code §§ 15-78-10, et seq. The Plaintiff alleges that these employing Defendants are liable for the acts and omissions of their respective employees' negligence, gross negligence, recklessness, and other liability forming conduct that caused harm to the Plaintiff.

8.      The employing Defendants are also sued for their acts and omissions in hiring, training, supervision, retention, and other types of supervisory claims under the South Carolina Tort Claims Act.

9.      The additional state law claims are so related to the federal claims that they form part of the same case or controversy.  As a result, this court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §1367.

10.      Venue is proper in the District of South Carolina under 28 U.S.C. § 1391.

11.      This case is assignable to the Greenville Division pursuant to Local Civil Rule 3.01.

**FACTUAL BACKGROUND**

12.      The allegations below are based upon the body worn camera footage from the

incident that occurred at Dianne M. Maros's home on October 20, 2019, as well as written or video statements obtained during investigations conducted by both the South Carolina Law Enforcement Division and the GCSO's Office of Professional Standards.

### *CURE'S MORNING INTERACTION AT MAROS RESIDENCE*

13.     On October 20, 2019, at approximately 8:00 a.m., Cure arrived at Plaintiff Dianne M. Maros's home located at 522 Cliffview Court, Greer, Greenville County, South Carolina.  She accompanied Master Deputy Cassel and another deputy.

14.     Cure and the other two deputies were called to the residence in response "to a call regarding an intoxicated subject involved in a nonviolent domestic situation with his mother." (GCSO CICB-2019-5).

15.     Upon their arrival at Maros's home, Cure and the other two deputies confirmed that the individuals referenced in the call were Sean Kaiser and his mother, Plaintiff Dianne M. Maros.

16.     Following their arrival, Cure and the other two deputies were informed by a neighbor that Kaiser struggled with addiction, mental illness, and possibly Asperger Syndrome. (SLED Investigative Report, File 34-19-0162).

17.     The neighbor further informed Cure and the other two deputies that Kaiser's mental illness caused him to be agitated when someone he did not know invaded his personal space. (Attachment 28. Interview SLED Investigative Report).

18.      Additionally, Maros informed Cure and the other two deputies that Kaiser wanted to be checked into the Phoenix Center for alcoholism treatment.  (Deputy Cure Voluntary Statement p. 3).

19.     Upon entering the residence, Cure observed Kaiser in his upstairs bedroom, sitting on the edge of his bed, playing a video game.  (Cure Voluntary Statement p. 3).

20.      Kaiser told Cure and the other two deputies that his biggest concern was getting into the Phoenix Center. (Cure Voluntary Statement p. 3).

21.      Kaiser told Cure and the other two deputies he believed he needed to be inebriated to be checked in for treatment.  (Cure Voluntary Statement p. 3).

22.      Throughout their conversation, Kaiser repeatedly told Cure and the other two deputies "thank you so much officers for your help." (Cure Voluntary Statement p. 3).

23.      After speaking with Kaiser, Cure and the other two deputies left the residence without incident.

24.      Cure's impression of Kaiser was that he "was cordial through the interaction." (Cure Voluntary Statement p. 3).

25.      At no time during this interaction did Kaiser threaten Deputy Cure or the other two deputies.

### *INVESTIGATION OF ALLEGED SHOPLIFTING*

26.      Several hours later, Cure was tasked with investigating an alleged shoplifting of a 6-pack of beer from a Spinx gas station.  (Cure Voluntary Statement p. 3).

27.      The value of the subject 6-pack of beer was approximately ten ($10) dollars.

28.      Cure viewed security camera footage from the gas station and observed a white male wearing joggers, tennis shoes, and a hoodie.  (Cure Voluntary Statement p. 3).

29.      Cure reported to Cassel she believed the male in the security camera footage to be Kaiser.  (Cure Voluntary Statement p. 3).

30.      However, Cure also reported to Cassel that she "could not confirm it was Sean." (Cure Voluntary Statement p. 3).

31.      Prior to retuning to Maros's home, Cure called Cassel, her field training officer,

and asked if she could question Kaiser about the alleged shoplifting of the 6-pack of beer from the Spinx. (Cure Voluntary Statement p. 4).

32.     Cassel advised Cure that she "could approach Kaiser but could not arrest him because the alleged shoplifting had not been freshly committed." (Cure Voluntary Statement p. 4).

33.     Cure understood this instruction to mean that she could question Kaiser but could not arrest him without first obtaining a warrant.

34.     Cassel told Cure that she "could just ask Sean plainly if he had been to the Spinx and if Sean answered 'yes' that [she] could just could read him Miranda and if Sean admitted to stealing the beer then [she] could proceed to the judge's office and sign warrants."   (Cure Voluntary Statement p. 4).

35.     Cassel also told Cure that if Kaiser "had stolen the beer we could go back another time to arrest." (Cure Voluntary Statement p. 4).

36.     Cure told Cassel that she "understood [her] limits with the investigation at this point." (Cure Voluntary Statement p. 4).

### *CURE RETURNS TO MAROS RESIDENCE*

37.     At approximately 12:30 p.m., Cure drove to Maros's home.

38.     Cure's bodycam video captured the entirety of the events that followed her arrival.

39.     A portion of the bodycam video was the subject of a Criminal Incident Community Briefing ("CICB"), prepared and released on YOUTUBE by the Greenville County Sheriff's Office. (https://www.youtube.com/watch?v=j6pgwTrg8xo).

40.     At approximately 12:41 p.m., Cure arrived at Maros's home, parked on the street, exited her vehicle, and walked towards the front door.

41.     At the time of her arrival, Cure had actual knowledge that Kaiser suffered from

mental illness.

42.        At the time of her arrival, Cure knew Kaiser was likely to be under the influence of alcohol.

43.        At the time of her arrival, Cure had actual knowledge that Kaiser, due to his mental illness, would likely become agitated if someone invaded his personal space.

44.        As Cure approached the front door, Kaiser exited the house through the front storm door.

45.        Cure approached Kaiser as he stood in front of the door on the front porch.

46.        Cure asked Kaiser whether he had been at the Spinx that morning, to which Kaiser replied "Yes." (CICB, Body Camera Clock 12:41:02).

47.        Cure announced that she would read Kaiser his Miranda rights. (CICB, Body Camera Clock 12:41:09).

48.        As Cure began to read Kaiser his Miranda rights, Kaiser calmly turned around, opened the storm door, and began to walk back into the house.

49.        By walking back into his house, Kaiser terminated the voluntary conversation with Cure.

50.        Kaiser had a right to terminate the voluntary conversation and go back inside his home.

51.        Despite knowing she could not arrest Kaiser, Cure grabbed Kaiser by his shirt and forcibly pulled on it in an attempt to prevent him from going back inside his home.

52.        As Kaiser entered the home, Cure grabbed the sleeve of Kaiser's shirt stating, "No, you're not.  Hey, hey, listen." (CICB, Body Camera Clock 12:41:28-33).

53.        Prior to Cure grabbing his shirt sleeve, Kaiser had not threatened Cure nor given

any indication that he was a threat to himself or to the public.

54.     Cure continued pulling at Kaiser's shirtsleeve and followed Kaiser into Maros's home.

55.     Cure had no legal basis to follow Kaiser into Maros's home.

56.     Cure's entry into Maros's home was unconstitutional.

57.     After Cure followed Kaiser into his home, the following exchange occurred between the two:

| | | |
|---|---|---|
| KAISER: | Please don't -- please don't do that. |
| CURE: | You don't run away from me. |
| KAISER: | I was sexually abused. |
| CURE: | This is nothing sexual.  Do not leave me again.  Do you understand? |
| KAISER: | Don't grab me. |
| CURE: | Don't run away from me. |
| KAISER: | Do not grab me. |
| CURE: | Do you want me to arrest you right here and right now? |

(CICB, Body Camera Clock 12:41:34-46).

58.     Despite her threat to do so, Cure had no legal basis to arrest Kaiser at that time.

59.     Arresting Kaiser at that time would have been unconstitutional.

60.     Cure continued to assert that she would put hands on Kaiser in the following exchange:

| | | |
|---|---|---|
| CURE: | Do not walk away from me or I will put hands on you. |
| KAISER: | I will respect you, and I will talk to you. |
| CURE: | Okay.  Don't walk away from me. |

> KAISER:    Don't fucking grab me.
>
> CURE:    That, I can't guarantee.

(CICB, Body Camera Clock 12:41:51 -12:42:00).

61.    Cure's repeated statements that she could grab Kaiser and he could not walk away were unlawful.

62.    Cure's repeated unlawful statements that she could grab Kaiser and he could not walk away foreseeably escalated the situation.

63.    Maros then entered her home and tried to de-escalate the interaction between Cure and Kaiser. (CICB, Body Camera Clock 12:42:10-11).

64.    Cure, instead of taking the opportunity to de-escalate the interaction following Maros's intervention, persisted by stating, "Listen, if you walk away from me, I have every right to lay hands on you.  Do not walk away from me again." (CICB, Body Camera Clock 12:41:12-19).

65.    At one minute and thirty-two seconds into the interaction, Cure called for backup and remained in the home. (CICB, Body Camera Clock 12:42:30-32).

66.    At this time, Cure could have simply left the home.

67.    There was no legal basis for Cure to remain in the home.

68.    Cure's choice to remain in the home was unlawful.

69.    At one minute and fifty-two seconds in the interaction, Cure attempted to reinitiate questioning by reading Kaiser his Miranda rights.  She stated, "Let's go back to what we're doing. I'm reading you Miranda.  Are you ready?"  (CICB, Body Camera Clock 12:42:54-56).

70.    Kaiser declined to answer.  This was the second time that Kaiser had indicated he would not answer Cure's questions.

71.       Still, Cure chose to remain in the home.

72.       There was no legal basis for Cure to remain in the home.

73.       Cure's choice to remain in the home was unlawful.

74.       At this time, GCSO Dispatch asked over the radio if Cure was "10-4" which is code of "Okay." Cure replied she was "10-4" or "Okay". (CICB, Body Camera Clock 12:42:59-43:01).

75.       Kaiser then began to walk up the stairs to the second floor. (CICB, Body Camera Clock 12:43:01).

76.       Kaiser had the right to retreat up the stairs within his home.

77.       As Kaiser attempted to retreat up the stairs, Deputy Cure grabbed Kaiser's arm and pulled him with enough force that Kaiser fell down to the floor.

78.       At this time, Cure could have simply let Kaiser go up the stairs.

79.       At this time, Cure could have simply left the home.

80.       There was no legal basis for Cure to remain in the home at this time.

81.       Cure's choice to remain in the home at this time was unlawful.

82.       Cure's choice to restrain Kaiser and pull him down to the ground in his own home was unlawful.

83.       Cure's choice to unlawfully remain in the home and unlawfully, physically restrain Kaiser foreseeably escalated the potential for aggression or violence between herself and others in the home.

84.       Kaiser then got back up and stated to Cure, "You cannot touch me. Please don't touch me is all I'm asking you." (CICB, Body Camera Clock 12:43:25-29).

85.       Deputy Cure then called for backup a second time. (CICB, Body Camera Clock 12:31:04-14).

86.      Kaiser continued walking up the stairs, stopped approximately three-quarters of the way up the stairs, turned around and sat down. (CICB, Body Camera Clock 12:43:33-43).

87.      For over two minutes, Kaiser sat in a peaceful, non-threatening manner approximately three-quarters of the way up the stairs while Cure stood at the base of the stairs. (CICB, Body Camera Clock 12:43:45).

88.      At that time, Kaiser was not an imminent threat to himself, Cure, or anyone else.

89.      Those more than two minutes gave Cure ample time to reassess to determine whether she should leave the house to get a warrant as previously instructed or even wait for backup to arrive until taking any further action.

90.      Kaiser repeatedly pleaded for Cure not to touch him.

91.      Cure's choice to unlawfully enter the home, unlawfully remain in the home, and unlawfully antagonize Kaiser foreseeably increased the risk of injury to Maros.

92.      Cure continued to yell at, threaten, and antagonize Kaiser and made the following statements to him:

    a.    "Listen, my partner is coming.  You're going to be under arrest.  Get back down here right now." (CICB, Body Camera Clock 12:43:40-45).

    b.    "You cannot walk away from a police officer. Let's go.  Get down here." (CICB, Body Camera Clock 12:43:51-54).

    c.    "Get down here.  I can't answer your questions like that, but me putting hands on you to tell you not to leave is not like being sexually abused."  (CICB, Body Camera Clock 12:44:31-38).

    d.    "Yeah, you're going to come because there is a bunch of people coming to me now." (CICB, Body Camera Clock 12:45:03-07).

93.     Cure continued to antagonize and escalate the interaction with Kaiser by stating that "Jail is going to be real hard on you, bud. Come down." (CICB, Body Camera Clock 12:45:13-17).

94.     At this time, Cure could have simply let Kaiser remain seated calmly on the stairs and left the home.

95.     At this time, Cure could have left the home and waited on her backup to arrive.

96.     At this time, if she believed she had a basis to arrest Kaiser, Cure could have followed her prior instructions and simply left the home and obtained a warrant from a judge.

97.     There was no legal basis for Cure to remain in the home at this time.

98.     There was no legal basis for Cure to continue threatening Kaiser with arrest at this time.

99.     Her choice to remain in the home at this time was unlawful.

100.    Her choice to unlawfully remain in the home and unlawfully, physically restrain Kaiser foreseeably escalated the situation and increased the risk of injury to the Plaintiff.

101.    Despite Kaiser sitting calmly on the stairs for over two minutes, Cure walked up the stairs to engage him physically.  (CICB, Body Camera Clock 12:46:00).

102.    Cure aggressively grabbed Kaiser in an attempt to pull him back down the stairs.

103.    Kaiser then told Cure he was not going to fight her and did not want to hurt her.

104.    Once Cure took her hands off Kaiser, Kaiser agreed to walk down the stairs.

105.    Kaiser then sat calmy at the base of the stairs. (CICB, Body Camera Clock 12:46:27).

106.    Again, at this time, Cure could have simply let Kaiser remain calmly seated on the stairs and left the home.

107.    Again, at this time, Cure could have left the home and waited on her backup to arrive.

108.    Again, at this time, if she believed she had a basis to arrest Kaiser, Cure could have followed the instructions given to her and simply left the home and obtained a warrant from a judge.

109.    There was no legal basis for Cure to remain in the home at this time.

110.    There was no legal basis for Cure to continue threatening Kaiser with arrest at this time.

111.    Her choice to remain in the home at this time was unlawful.

112.    Her choice to unlawfully remain in the home and unlawfully, physically restrain Kaiser foreseeably escalated the situation and increased the risk of injury to the Plaintiff.

113.    Cure chose to continue to antagonize Kaiser through her language and physical behavior and foreseeably escalated the situation and increased the risk of injury to the Plaintiff.

114.    A reasonable law enforcement officer would have employed different tactics.

115.    As Kaiser sat at the base of the stairs, Cure continued:

CURE:  Turn around. Turn around.

KAISER:  I don't want to hurt you.

CURE:  Great.  Turn around.  *(pulls out handcuffs)*

KAISER:  No.  That's all right.

CURE:  Okay.  You're going to get a resisting charge.

KAISER:  Why would you do that?

CURE:  Because it's the law, Sean.  Welcome to the law.

(CICB, Body Camera Clock 12:46:27-57).

116.    While Kaiser continued to sit unthreateningly at the base of the stairs, Cure told Kaiser, "You're breaking the law, is what you're doing.  Okay?  And as soon as the rest of them come in, you're going in handcuffs and you're going to jail."  (CICB, Body Camera Clock 12:47:24-31).

117.     Cure also told Kaiser that, "I'll wait as long as you're willing to wait. They're coming."  (CICB, Body Camera Clock 12:47:35-37).

118.    Cure had the time and opportunity to assess the legality of her actions.

119.    Cure had the time and opportunity to de-escalate her interaction with Kaiser.

120.    Instead, Cure chose to continue to antagonize Kaiser through her language and physical behavior and foreseeably escalated the situation and increased the risk of injury to the Plaintiff.

121.    Immediately before Cure moved in towards Kaiser in an attempt to physically restrain and arrest him, Cure and Kaiser had the following interaction:

> KAISER:  That's okay.  They can come and they can arrest me, and it won't matter.
>
> CURE:  Great.  I will happily take you down to jail. That's where you can stay.
>
> KAISER:  Okay.  I never meant to hurt you.
>
> CURE:  Yeah, you're still not obeying, though. You're not complying.  You need to stand up and put your hands behind your back.
>
> KAISER: I don't mean to hurt you.  I'm sorry.  I'm sorry.  If I hurt you, it's not who I am.
>
> CURE:  It is right now.
>
> KAISER:  Well, I'm sorry.
>
> CURE:  It would be a lot easier if you would stand up and just put your hands

behind your back.

KAISER:  Control, you like that song?  Is that why you got into this job?

(CICB, Body Camera Clock 12:47:41-48:40).

122.     Cure then moved in attempted to physically restrain and arrest Kaiser by forcibly grabbing him.

123.     There was no legal basis for Cure to remain in the home at this time.

124.     There was no legal basis for Cure to arrest Kaiser at this time.

125.     Her choice to remain in the home at this time was unlawful.

126.     Her choice to attempt to restrain and arrest Kaiser at this time was unlawful.

127.     Her choice to unlawfully remain in the home and unlawfully attempt to restrain and arrest Kaiser foreseeably escalated the situation and increased the risk of injury to the Plaintiff.

128.     Kaiser plead with Cure repeatedly saying, "I am asking you to do this nice," three separate times. (CICB, Body Camera Clock 12:48:43-49:08).

129.     Kaiser attempted to pull away from Cure.  (CICB, Body Camera Clock 12:48:57)

130.     Both the neighbor, who was now present in the home, and Maros attempted to de-escalate the interaction between Kaiser and Cure.

131.     Cure can then be heard telling Maros and the neighbor, to "Get out of the way." (CICB 12:49:06).

132.     The neighbor plead with Cure – asking Cure to wait – and volunteered to try to talk with Kaiser.  (CICB 12:49:09-12).

133.     Cure continued to attempt to physically restrain and arrest Kaiser despite the pleas from the neighbor and Maros.

134.     Kaiser grabbed and held onto Cure's wrists and pushed her back away from him.

(CICB, Body Camera Clock 12:49:14-32).

135.    Cure screamed repeatedly for Kaiser to "let go of me." Kaiser responded "I am stronger than you" and "I can do whatever I want" and repeated his request "I am asking you to do this nice." (CICB 12:49:14-39).

136.    Kaiser's response was a foreseeable result of Cure's unlawful entry into Maros's home, Cure's unlawful attempts to arrest Kaiser, and Cure's continued escalation of the interaction between herself and Kaiser.

137.    Both Maros and the neighbor were able to separate Cure and Kaiser and convinced Kaiser to sit back down on the steps. (CICB, Body Camera Clock 12:49:32-40)

138.    Cure then created distance between herself and Kaiser by backing to the other side of the room – away from the stairs where both Maros and the neighbor were talking with Kaiser and working to de-escalate the interaction.

139.    Cure was able to place herself at a safe distance from Kaiser.

140.    While doing so, Cure drew her handgun. (CICB, Body Camera Clock 12:49:37)

141.    Cure did not attempt to produce or use any less lethal weapons.

142.    Cure aimed her handgun at Kaiser, where both the neighbor and Maros were standing with him as they were continuing to speak to Kaiser in an attempt to de-escalate the situation.

143.    Cure then yelled at the neighbor and told her to back away from Kaiser, preventing the neighbor's ability to de-escalate the situation. (CICB, Body Camera Clock 12:49:39).

144.    Maros remained with her son, standing over him while he sat at the base of the stairs. (CICB, Body Camera Clock 12:49:37-55).

145.    Maros asked Cure to wait in an attempt to de-escalate the interaction between Cure

and Kaiser.  (CICB, Body Camera Clock 12:49:45-47).

146.    Cure's response to Maros was "Do not tell me what to do." (12:49:47)

147.    Maros then asked Cure if she could wait for backup. (CICB, Body Camera Clock 12:49:47-49).

148.    Cure screamed "No" at Maros. (CICB, Body Camera Clock 12:49:49).

149.    Cure then screamed "back up" at Maros three times demanding she move away from Kaiser as he was sitting on the stairs. (CICB, Body Camera Clock 12:49:49).

150.    On the third "back up", Cure closed the distance with Kaiser and his mother Maros at the base of stairs. (CICB, Body Camera Clock 12:49:49-53).

151.    Maros told Cure she was making it worse.  (CICB, Body Camera Clock 12:49:54-55)

152.    Cure then physically pushed Maros away from Kaiser. (CICB, Body Camera Clock 12:49:54-56).

153.    When Cure pushed Maros while holding her hand gun, Kaiser, both mentally ill and intoxicated, viewed this as a threat to his mother.

154.    Kaiser then got up and moved quickly towards Cure while yelling "you don't fucking touch my mother in my fucking house." (CICB, Body Camera Clock 12:49:59).

155.    Cure fired her handgun one handed, missing Kaiser but hitting Maros.

156.    Maros suffered a gunshot wound to her abdomen.

157.    Cure fired another shot at Kaiser and missed.

158.    Cure and Kaiser then became involved in a physical altercation while Kaiser yelled "you fucking hurt my mother." (CICB, Body Camera Clock 12:50:07-12).

159.    Cure was able to push Kaiser away with her legs while they were on the floor.

160.     Kaiser repeatedly yelled "don't hurt my mother." (CICB, Body Camera Clock 12:50:20-22).

161.     Shortly thereafter, Cure's backup arrived and physically subdued Kaiser. (CICB, Body Camera Clock 12:50:33).

162.     Kaiser was then placed under arrest.

163.     Cure's backup arrived just three minutes after Cure claimed she was willing to wait.

164.     Cure's backup arrived less than a minute after Maros asked Cure to wait for backup as she stood at the base of the stairs with Kaiser sitting on the steps.

165.     As a direct and proximate result of the acts and omissions of the Defendants, Maros suffered significant injuries and damages, and will suffer such injuries and damages in the future, including, but not limited to, physical injury, disfigurement and disability, pain and suffering, emotional and mental distress, and medical expenses.

166.     Maros had one bullet removed from her abdomen, and has had to undergo no fewer than fifteen surgeries as a result of the gunshot wound.  She continues to undergo medical care.

167.     The above acts and omissions of Cure showed deliberate indifference to the rights of Maros.

168.     Cure had ample opportunity and time to consider each of her acts and decisions.

169.     Cures acts as described above were not those of a reasonable officer.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983
### (As to Defendant Cure)

170.     The allegations contained in the preceding paragraphs are incorporated herein as if fully repeated verbatim.

171.    Cure, at all times relevant hereto, was acting under the color of state law in her capacity as a Deputy for the GCSO and her acts or omissions were conducted within the scope of her official duties or employment.

172.    At the time of the above-stated events, Maros had the clearly established constitutional rights under the Fourth and Fourteenth Amendments:

    a.    to be free in her persons and property from unreasonable search and seizures as secured by the Fourth and Fourteenth Amendments;

    b.    to be free from unlawful, reckless, deliberately indifferent, and conscience shocking searches and seizures as secured by the Fourth and Fourteenth Amendments;

    c.    to be free from the use of unlawful force as secured by the Fourth and Fourteenth Amendments; and

    d.    to be free from injury and detention without substantive due process and from state created/enhanced danger as secured by the Fourteenth Amendments.

173.    The above-stated rights were known or should have been known to Cure at the time of the above complained of conduct.

174.    Cure's actions were unreasonable in light of the facts and circumstances confronting her and her actions were malicious and/or involved reckless, callous, and deliberate indifference to Maros's constitutionally protected rights.

175.    Cure's actions shock the conscious.

176.    Cure is not entitled to qualified immunity for the complained of conduct.

177.    As a direct and proximate result of Cure's violation of Maros's constitutional rights, Maros has suffered and continues to suffer physical and emotional injuries, and other damages, in

amounts to be determined at trial.  Furthermore, Maros has incurred or will incur special damages, including medically related expenses.

178.     Upon information and belief, Maros may suffer lost future earnings and impaired earning capacities from the above-stated injuries.

179.     In addition to compensatory, economic, consequential, and special damages, Maros is entitled to attorney fees and costs pursuant to 42 U.S.C.§ 1988.  Maros is also entitled to punitive damages against the Defendants under 42 U.S.C. § 1983, in that the actions of Cure were malicious, willful, a reckless, wanton, and were undertaken with deliberate indifference to Maros's constitutional rights.

## SECOND CAUSE OF ACTION
### 42 U.S.C § 1983
**(As to Defendants Greenville County Sheriff's Office and Greenville County)**

180.     The allegations contained in the preceding paragraphs are incorporated herein as if fully repeated verbatim.

181.     At the time of the above-stated events, Maros had the clearly established constitutional rights under the Fourth and Fourteenth Amendments

a.   to be free in her persons and property from unreasonable search and seizures;

b.   to be free from unlawful, reckless, deliberately indifferent, and conscience shocking searches and seizures;

c.   The right to be free from the use of unlawful force;

d.   The right to be free from injury and detention without substantive due process and from state created/enhanced danger; and

e.   Other particulars that may be learned in discovery.

182.    The GCSO and Greenville County, acting by and through the Sheriff, County Council, or other policymakers, had final policymaking authority with regard to establishing written policies, customs, and training programs governing the conduct of deputies performing policing functions on behalf of the citizens of Greenville County.

183.    The GCSO and Greenville County established, approved, or ratified GCSO's written policies, customs, and training governing the conduct of Greenville County Sheriff's Deputies performing policing functions on behalf of the citizens of Greenville County.

184.    The written policies, customs, and training established, approved, or ratified by the GCSO and Greenville County were the moving force behind and the cause of the above-stated constitutional violations and Maros's injuries.

185.    The GCSO and Greenville County, acting by and through the Sheriff, County Council, or other policymakers, had knowledge of GCSO's unconstitutional customs, patterns, and practices and knowledge that the same gave rise to a risk of violations of the federal rights of the citizens of Greenville County.

186.    The GCSO and Greenville County, acting by and through the Sheriff, County Council, or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from GCSO's unconstitutional customs, patterns, and practices and were deliberately indifferent to and/or tacitly authorized same.

187.    On or prior to October 20, 2019, GCSO and Greenville County, with deliberate indifference to the rights of individuals subject to search, seizure, arrest, and the like, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the safety of individuals subject to search, seizure, arrest, and the like during the search, seizure, or arrest process.

188.    On or prior to October 20, 2019, GCSO and Greenville County, with deliberate indifference to the rights of individuals subject to search, seizure, arrest, and the like, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned or required deputies to ignore actual knowledge or obvious signs of mental illness of individuals subject to search, seizure, arrest, and the like, leading to a foreseeable escalation in the potential for aggression or violence.

189.    On or prior to October 20, 2019, GCSO and Greenville County, with deliberate indifference to the rights of individuals subject to search, seizure, arrest, and the like, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

190.     On or prior to October 20, 2019, GCSO and Greenville County, with deliberate indifference to the rights of individuals subject to search, seizure, arrest, and the like, tolerated, permitted, failed to correct, promoted, or ratified its agents providing insufficient, improper, or harmful training to deputies.

191.    On or prior to October 20, 2019, GCSO and Greenville County, knew its deputies were inadequately trained to interact with individuals suffering from mental illness.

192.    With deliberate indifference to the constitutional rights of Greenville County citizens, GCSO and Greenville County failed to provide adequate training to its deputies regarding interaction with individuals suffering from mental illness.

193.    GCSO and Greenville County were aware that deprivation of the constitutional rights of Greenville County citizens was likely to result from its lack of training and the failure to modify its training.

194.     Accordingly, GCSO and Greenville County were deliberately indifferent and exhibited reckless disregard with respect to the potential violation of constitutional rights of Greenville County citizens.

195.     The failure to adequately train or modify training constituted official GCSO and Greenville County policies, practices, or customs.

196.     Specifically, and without limitation, on or prior to October 20, 2019:

   a.   GCSO deputies had been involved in prior violent and/or deadly interactions with individuals suffering from mental illness where the involved deputies were insufficiently trained to interact with and de-escalate contacts with those individuals;

   b.   Training to avoid or limit violent or deadly interactions with individuals suffering from mental illness was available free-of-charge to the GCSO through the National Alliance on Mental Illness ("NAMI");

   c.   Despite this training being free-of-charge, the majority of GCSO deputies, including Defendant Cure, had not received the training;

   d.   Other local law enforcement agencies, including the Greenville Police Department, had proactively trained a majority of its officers and established dedicated Crisis Intervention Teams to address interactions with mentally ill citizens;

   e.   Despite knowledge of the insufficiency of its training for the majority of its deputies, GCSO still sent improperly trained deputies to respond to calls involving individuals known to have mental illness.

197.     The failure by GCSO and Greenville County to properly train GCSO deputies to interact with individuals known to have mental illness constitutes a deliberate choice by those

officials responsible for establishing final policymaking with respect to interactions with mentally ill individuals despite the existence of various alternatives.

198.    As a direct and proximate result of the acts and omissions described hereinabove, Maros has suffered and continues to suffer physical and emotional injuries, and other damages, in amounts to be determined at trial. Furthermore, Maros has incurred or will incur special damages, including medically related expenses.

199.    Upon information and belief, Maros may suffer lost future earnings and impaired earning capacities from the above-stated injuries.

200.    In addition to compensatory, economic, consequential, and special damages, Maros is entitled to attorney fees and costs pursuant to 42 U.S.C.§ 1988.

### THIRD CAUSE OF ACTION
**Negligence and Gross Negligence**
**(As to all Defendants)**

201.    The allegations contained in the preceding paragraphs are incorporated herein as if fully repeated verbatim.

202.    At all times relevant hereto, Cure was employed as a deputy sheriff with the Greenville County Sheriff's Office and was acting within the course and scope of her employment with the Greenville County Sheriff's Office.

203.    Defendants were negligent, careless, grossly negligent, reckless and acted in violation of the duties owed to the Maros in that they committed one or more of the following acts or omissions, any or all of which were departures from the prevailing duties of care:

   a.   in failing to ensure the safety of the Plaintiff;

   b.   in failing to appreciate the conditions that existed on the day in question;

   c.   in failing to adhere to proper law enforcement procedures and tactics;

d.   in failing to use less lethal forms of force in order to effectuate an arrest or seizure;

e.   in failing to use discretion and consider other reasonably available methods;

f.   in failing to have in place proper and adequate policies, procedures and protocols for law enforcement officers to investigate calls, training of officers or, if such policies, procedures and protocols were in place, in failing to use due care to enforce them; and

g.   in such other particulars as may be ascertained through discovery.

204.   As a direct and proximate result of Defendants' gross negligence, Maros was injured and is entitled to damages, including legally presumed and special damages, in addition to actual, compensatory, general, and nominal damages. The special damages include, but are not limited to, medical expenses and other physician expenses and repair and replacement to damaged property, including Maros's home. Maros suffered physical harm, and was forced to incur medical treatment and bills, both in the past and in the future as well.  Maros has and will continue to suffer severe emotional harm, and mental shock and suffering. She suffered severe and extreme emotional distress, anxiety, and grief, and other harms and losses.  Her injuries include, but are not limited to, physical injury, disfigurement and disability, pain and suffering, emotional and mental distress, and medical expenses, that will continue into the future.

## FOURTH CAUSE OF ACTION
### Negligent and Gross Negligent Hiring, Supervision, Training, and Retention
### (As to Employing Defendants)

205.   The allegations contained in the preceding paragraphs are incorporated herein as if fully repeated verbatim.

206.    Employing Defendants each had a duty to hire competent and fit employees to perform background checks, to require appropriate education, experience, and other qualifications, to properly train employees, to properly supervise employees, and to terminate unfit employees.

207.    The Defendants breached their duties to adequately hire, supervise, train, and retain employees and acted in a negligent and grossly negligent and reckless manner as follows:

    a.    In failing to ensure that employees complied with procedures regarding the incidents such as those described herein;

    b.    In failing to ensure that employees complied with procedures regarding arrests, seizures, and interactions with the mentally ill;

    c.    In failing to train law enforcement officers regarding proper procedures for arrests, seizures, and interactions with the mentally ill and;

    d.    In other such ways that discovery reveals.

208.    As a direct and proximate result of Defendants' gross negligence, Maros was injured and is entitled to damages, including legally presumed and special damages, in addition to actual, compensatory, general, and nominal damages. The special damages include, but are not limited to, medical expenses and other physician expenses and repair and replacement to damaged property, including Maros's home.  Maros suffered physical harm, and was forced to incur medical treatment and bills, both in the past and in the future as well.  Maros has and will continue to suffer severe emotional harm, and mental shock and suffering. She suffered severe and extreme emotional distress, anxiety, and grief, and other harms and losses. Her injuries include, but are not limited to, physical injury, disfigurement and disability, pain and suffering, emotional and mental distress, and medical expenses, that will continue into the future.

WHEREFORE, Plaintiff Dianne M. Maros respectfully prays for judgment against the Defendants and for damages state herein, including compensatory, general, actual, special, nominal and punitive damages, plus pre and post judgment interest, in an amount to be determined by a jury at the trial of this action as well as attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

Respectfully submitted,

THE CLARDY LAW FIRM, P.A.

s/ Timothy A. Nowacki
Timothy A. Nowacki (Fed. Bar No. 11660)

s/ Andrew F. Carson
Andrew F. Carson (Fed. Bar No. 11247)
872 South Pleasantburg Drive
Greenville, South Carolina 29607
Telephone: (864) 233-8888
Facsimile:  (864) 233-8889
Email:  Tim@theclardylawfirm.com
             Andrew@theclardylawfirm.com

October 13, 2021
Greenville, South Carolina