IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Dianne M. Maros, | ) | Case No.: 6:21-cv-3346-JD-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **Order and Opinion** |
| Ashley Elizabeth Cure, Greenville County, | ) | |
| Greenville County Sheriff's Office, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court with the Report and Recommendation ("Report") of United States Magistrate Judge Jacquelyn D. Austin, made under 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) of the District of South Carolina.[1] (DE 47.) Plaintiff Dianne M. Maros ("Plaintiff" or "Maros") brought this action based on Defendant Ashley Elizabeth Cure's ("Cure") accidental shooting of Plaintiff arising out of Cure's attempt to question and arrest Plaintiff's adult son in Plaintiff's home. (DE 1.) Maros asserts a claim against Cure under 42 U.S.C. § 1983 for violating her Fourth and Fourteenth Amendment rights. (DE 1, ¶¶ 170–79.) She also alleges state-law claims of negligence and gross negligence against County Defendants Greenville County and Greenville County Sheriff's Office ("County Defendants") and claims of negligent and gross negligent hiring, supervision, training, and retention against the County Defendants. (Id. at ¶¶ 201–08.) Maros seeks money damages, pre-and post-judgment interest, and attorneys' fees and costs. (Id. at 26.)

---

[1] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

1

On June 30, 2023, the County Defendants and Cure (collectively "Defendants") moved for Summary Judgment. (DE 39, DE 40.) On July 14 and 21, 2023, Maros filed responses opposing the motions, and Cure filed a reply. (DE 41, 42, and 44.) County Defendants contend, among other things, that they are entitled to immunity from suit in federal court under the Eleventh Amendment, and Cure argues she is entitled to qualified immunity. On January 24, 2024, the Magistrate Judge issued the Report (DE 47), recommending that Defendants' Motions for Summary Judgment (DE 39, DE 40) be granted on all of Maros' claims in her Complaint. The Court adopts the Report and Recommendation as provided here for the reasons stated below.

## BACKGROUND

The Report and Recommendation sets forth the relevant facts and legal standards, which the Court incorporates without a complete recitation. In any event, the Court provides this summary as a brief background relating to the objections raised by Plaintiff.

**The Initial Response to Plaintiff's Home**

At all times relevant to the incident that is the subject of this case, Cure was a Greenville County Sheriff's Office deputy. (DE 41-1, pp. 29, 31.) On October 20, 2019, at around 8:00 a.m., Cure, Master Deputy Cassel, and Deputy Andrew Otto responded to Plaintiff's home regarding a call concerning an intoxicated subject, "Kaiser," who was involved in a nonviolent domestic situation with his mother. (Id. at 5, 10, 19–20, 56, 65.) Outside the home, the deputies had a discussion with Plaintiff and her neighbor, Margaret Roberts, in which they were advised that Kaiser struggled with addiction, mental illness, and possibly Asperger Syndrome. (Id. at 10, 66.)

Upon entering the residence, Cure observed Kaiser in his bedroom, sitting on the edge of his bed and playing a video game. (Id. at 56.) While in the room, Cure noticed several cans and two or three more beer boxes. (Id.) She also observed a long knife on a table. (Id.) Kaiser told

the officers he had no plans to harm himself and that he wanted to be admitted to the Phoenix Center for alcoholism treatment. (Id.) During the encounter, Kaiser thanked the deputies several times for their help. (Id.)

**The Return to Plaintiff's Home to Investigate the Shoplifting**

Several hours later, Cure was sent to investigate an alleged shoplifting of beer from a convenience store ("Spinx"). (Id.) Cure viewed the store's security camera footage and concluded from the footage and from the fact that the stolen beer was the same type she had seen in Kaiser's room earlier that day that it might have been Kaiser who took the beer. (Id.) Cure, therefore, drove to Plaintiff's home to question him. (Id. at 57; AC 2:43–3:11.[2]) On the way, Cure encountered Plaintiff, who reported that she had bought Kaiser a coffee and a sandwich in hopes of "sobering him up a little," and she referred to Kaiser as "screaming at the top of his lungs." (AC 0:57–1:42.) Cure told Plaintiff that she was heading to Plaintiff's house to investigate her suspicion that Plaintiff had recently stolen beer from the Spinx within the last two hours. (AC 2:43–3:28.)

Cure proceeded through Plaintiff's neighborhood, parked near her house, and asked Plaintiff to remind her which house was hers. (AC 3:56–5:16.) Plaintiff pointed out her house and parked in front of Cure. (AC 5:17–5:21.) As Cure approached the front of the home, Kaiser emerged from the front door. (AC 5:30.) Kaiser is six feet, two inches tall, and weighs 220 pounds, while Cure is five feet, two and one-half inches tall. (DE 40-4, p. 3; DE 40-5.)

Cure asked Kaiser whether he had been at the Spinx earlier, and when he said that he had, Cure told him she would read him his Miranda rights and ask him some questions. (AC 5:34–5:57.) As she began reading his rights, he turned and began to reenter the home. (AC 5:58–6:02.)

---

[2]  Docket Entry Number 41-5 is a media file placeholder for a recording from Cure's body camera worn during the incident that is the subject of this case. Plaintiff submitted a DVD with this recording. The Court cites the recording in the format [AC x:xx–x:xx].

3

Cure grabbed his shirt and told him not to go back inside, but she followed him when he continued into the house. (AC 6:02–6:08.)

Once both were inside, an argument ensued wherein Cure repeatedly ordered Kaiser not to walk away, and Kaiser repeatedly ordered her not to touch him. (AC 6:05–7:15.) At one point, Kaiser leaned in toward Cure and said threateningly and angrily, "Don't f***ing grab me!" (AC 6:35.) Throughout the argument, Plaintiff stood nearby and told Kaiser to calm down and comply with Cure's orders, making comments such as "[Cure] is trying to help you" and "don't you talk to her like that." (AC 6:35–6:46.) Kaiser continued to yell and curse at Cure, and Cure called for backup. (AC 6:55–7:10.) At one point, Kaiser tried to go up the steps, and Cure grabbed his arm and pulled him back, with Kaiser responding by making a threatening gesture, prompting Plaintiff to exclaim, "[Kaiser], don't you dare." (AC 7:38–8:05.) Kaiser then went about two-thirds of the way up the staircase, sat down, and refused to come down. (AC 8:05–8:30.)

Cure told Kaiser that her partner was on the way and that Kaiser would be arrested. (AC 8:15–8:20.) At the top of the stairs, Kaiser admitted that he had stolen the beer. (AC 8:35–8:50.) About two minutes later, with no backup, Cure proceeded up the stairs and grabbed Kaiser's arm. (AC 10:32–10:38.) Kaiser said twice, "I'm not gonna fight you," but he also said, "I am stronger than you." (AC 10:42–10:47.) Kaiser started down the stairs and repeated several times, "I don't want to hurt you." (AC 10:49–11:01.) Cure asked Kaiser to turn around when he reached the bottom of the stairs, but he just sat down on the stairs and repeated, "I don't want to hurt you." (AC 11:02–11:07.) As he continued refusing to comply with her orders, Cure told Kaiser he would be charged with resisting arrest. (AC 11:24–11:26.) He began to ask her questions such as whether she felt powerful and whether she entered law enforcement because she liked control. (AC 11:29–

4

13:16.) During these questions, Roberts approached the front doorway from the street, and Cure tried to wave her away. (AC 12:30–12:44.)

Cure then grabbed Kaiser's left arm, and he stood up. (AC 13:20–13:30.) Cure told him she was arresting him, and he began to resist, repeatedly yelling, "I'm asking you to do this nice," while she yelled, "Get out of the way," apparently to Plaintiff. (AC 13:25–13:43.) The struggle increased in intensity, and Kaiser grabbed Cure's arms as Plaintiff grabbed Kaiser's right arm. (AC 13:49.) Cure twice yelled, "Let go of me!" (AC 13:47–13:51.) Still, Kaiser refused to let go, and he leaned his face close to Cure's and said forcefully, "I am stronger than you! I can do whatever I f***ing want!" as Cure continued to scream, "Let go of me!" (AC 13:51–13:59.) Then Kaiser pushed Cure onto her back onto a chair as the two continued to struggle, with Kaiser standing over her, Cure screaming, and Plaintiff pleading with her son to stop. (AC 14:00–14:08.)

At that point, Roberts, who had entered the home, became concerned that Kaiser was "going to kill" Cure. (DE 41-1, p. 67.) Roberts took Kaiser's "face in [her] hands and turned his face away from" Cure. (Id.; AC 14:04–14:07.) Cure got to her feet and pushed Kaiser back. (AC 14:08–14:11.) As she did so, Cure drew her pistol and pointed it at Kaiser as she stood only a few feet from him, Plaintiff, and Roberts. (AC 14:11–14:12.) As Cure pointed the weapon, Roberts moved a few feet to the side, but Plaintiff remained beside Kaiser. (AC 14:10–14:18.) Plaintiff tried to use her body and her hand to shield Kaiser, who was leaning on the steps, while Cure yelled for her to put her hands down and back up. (AC 14:10–14:23.) Kaiser said, "If you want to shoot me you f***ing shoot me." (AC 14:15–14:18.) Cure then yelled several more times for Plaintiff to back up and put her hands down, and Cure tried to use her left hand to push Plaintiff to the side. (AC 14:18–14:28.) Plaintiff asked Cure to wait for backup, and Cure told Plaintiff not

5

to tell her what to do. (AC 14:18–14:24.) Cure continued to yell for Plaintiff to back up, and Cure moved in once more, apparently trying again to push Plaintiff out of the way. (AC 14:24–14:30.)

At that point, Kaiser suddenly stood up and began moving toward Cure, and Cure began to backpedal. (AC 14:30.) Plaintiff tried to hold Kaiser back, but he broke free, saying to Cure, "You don't f***ing touch my mother in my f***ing house," and falling briefly onto the coffee table. (AC 14:30–14:34.) Although Cure continued to move back, Kaiser quickly regained his footing and stormed toward her. (AC 14:34–14:35.) Cure fired her weapon at Kaiser as he was only about a step or two away from her. (AC 14:34–14:35.) The bullet missed Kaiser and struck Plaintiff in the abdomen. (DE 41-1, pp. 24, 33.)

Kaiser continued forward, touched Cure, bounced off her, and fell into a side table and lamp. (AC 14:35–14:38.) He quickly got up and again moved toward her. (AC 14:38–14:39.) Cure again fired her weapon at Kaiser from point-blank range, and again, the bullet missed. (AC 14:38–14:39; DE 41-1, pp. 24, 33.) Kaiser attacked Cure, and the two struggled and fell to the floor as Kaiser repeatedly yelled, "You f***ing hurt my mother!" (AC 14:39–14:59.) After a few seconds, the struggle ended, and Kaiser sat back on his knees by the front door. (AC 15:00–15:07.) Moments later, Cure's backup officer arrived and subdued Kaiser, and Cure handcuffed him. (AC 15:08–16:26.)

## DISCUSSION

Maros objects to the Report raising five errors: (1) the Report ignores facts that show Cure's actions were inappropriate and not entitled to qualified immunity, (2) a deliberate indifference standard should apply to Maros' Fourteenth Amendment claim not intent to harm, (3) Cure is not entitled to qualified immunity on Maros' Fourteenth Amendment claim, 4) facts in the record support that Cure acted with deliberate indifference, and 5) the Report erred in evaluating

Maros' Fourth Amendment claims.[3] (See DE 48.) Maros' objections center on the totality of the events in question, which establish her Fourth and Fourteenth Amendment claims. However,

---

[3]    Maros alleges the Magistrate Judge "erred in failing to view the facts, and the inferences drawn from the facts, in the light most favorable to Plaintiff, the non-moving party and in not concluding that those facts, when viewed properly, create, at a minimum, a genuine issue of material fact." Maros points to the following facts that are not contained in the Report:

a) The Report omits that Cure was told that Kaiser's mental illness caused him to become agitated when someone he did not know invaded his personal space. (ECF #41-1, Office of Professional Standards Report, 3-4); b) The Report omits that Defendant Cure's supervising officer explicitly told her she could question Kaiser but not arrest him because the alleged shoplifting had not been freshly committed. (ECF #41-3, Deputy Cure Voluntary Statement¸ 1); c) The Report omits that Defendant Cure acknowledged the limits of her investigation when prior to returning to Plaintiff's residence. *Id.*; d) The Report omits that almost immediately after Defendant Cure touched Kaiser, he asked that she please not touch him and that he had been sexually abused. (ECF #41-5, Cure Body Worn Camera 12:41:34-36); e) The Report omits that within seconds of beginning to interview Kaiser, Defendant Cure threatened to arrest him despite having no authority to do so and having been explicitly instructed that she could not arrest him. *Id.*; f) The Report omits that Defendant Cure acknowledged she was "10-4" or "Okay," – or not in an emergency situation -- approximately one minute and thirty seconds after she entered Plaintiff's home. Id. at 12:42:59-43:01; g) The Report omits that during the over two minutes Kaiser was sitting calmly about three-quarters of the way up the stairs, he attempted to explain that he'd been sexually abused and didn't like to be touched. *Id.* at 12:44:31; h) The Report omits that shortly after Kaiser reiterated his history of being sexually abused, Defendant Cure stated "Jail is going to be real hard on you, bud." *Id.* at 12:45:03-17. i) The Report omits that seven minutes into her interaction with Kaiser, and after Kaiser had moved calmly down to the bottom of the stairs, Defendant Cure told him "I'll wait as long as you're willing to wait." *Id.* at 12:47:35-37. j) The Report omits that despite her statement that she would wait as long as Kaiser was willing to wait, she waited less than seventy (70) seconds before moving in to attempt to physically restrain and arrest Kaiser; Id. at 12:47:40-48:43; k) The Report omits that immediately prior to attempting restrain Kaiser and arrest him, Cure again radioed that she was "10-4" or "Okay," -- or not in an emergency situation. *Id.* l) The Report omits or dismisses that at the time she moved into attempt to restrain him, Defendant Cure knew i) Kaiser was significantly larger and stronger than she, ii) Kaiser was likely intoxicated, iii) Kaiser had been sexually assaulted and potentially suffered from mental illness which caused him to become agitated when touched or when his personal space was invaded, and iv) that at that time she moved in he posed no threat to her or to anyone else. (ECF #41-7, OPS Post Counseling Report, 7-8); m) The Report omits that Deputy Cure had actual knowledge and training that interacting with Mentally Ill and Emotionally Disturbed Persons such as Kaiser in the manner that she did would increase the likelihood of him responding with violence. (ECF #41-1, Office of Professional Standards Report, 26). n) The Report omits that Deputy Cure admitted she felt pressured to handle and finish the call on her own. (*Id.* at 215). Such an admission could suggest to a reasonable fact finder that any lack of time to deliberate was of Cure's own making.  o) The report omits that in its review of this incident, OPS determined Defendant Cure had at least three instances of discretionary time wherein she could reflect on her actions, deliberate, and make unhurried judgments. (ECF #41-7, OPS Post

objections to a report and recommendation must be specific to be actionable. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- *that are at the heart of the parties' dispute*.'" Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (2005) (citing Thomas v. Arn, 474 U.S. 140 (1985) (emphasis added)). In the absence of specific objections to the Report and Recommendation of the magistrate judge, this court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

First, turning to Maros' Fourth Amendment objection, Maros claims the Report erred in evaluating her claim in the following ways:

> a. in holding that the Fourth Amendment's requirement that law enforcement officials not enter a private home without a warrant except under exigent circumstances is not clearly established;[4]

---

Counseling Report, 7-8). p) The Report omits that after the initial physical altercation between Kaiser and Defendant Cure, Defendant Cure was able to create distance between herself and Kaiser while drawing her firearm. (ECF #41-5, Cure Body Worn Camera 12:49:37); q) The Report omits that after creating distance between herself and Kaiser, Defendant Cure ignored pleas from Plaintiff that Cure was making it worse and to wait for backup. *Id* at 12:49:45-47. r) The Report omits that after creating distance between herself and Kaiser, Kaiser was still sitting at the base of the stairs when Defendant Cure elected to close the distance again and push Maros away. *Id.* at 12:54-56.

(DE 48, pp. 11-13.) That said, this Court's de novo review of the record includes consideration of the above facts. In any event, these facts are not disputed based on a review of the body-worn camera video, so Plaintiff's objection is overruled on that point.

[4]     The Report makes no such finding. Rather, the Report found that "[a]t the very least . . . it cannot be said that it was clearly established at the time of the incident in question that an officer was precluded from executing a Terry stop within the curtilage of a suspect's home." (DE 47, p. 19.) Thus, the objection to the Report on this ground is overruled.

> b. in holding that the Fourth Amendment's requirement that law enforcement officials not enter a private home without a warrant except under exigent circumstances describes the law only at a "high level of generality" rather than the appropriate level of specificity;
>
> c. in concluding that no reasonable officer in Defendant Cure's position would have known that entry into Plaintiff's home under the facts and circumstances of this case was in violation of the Fourth Amendment;
>
> d. in finding that Defendant Cure was in hot pursuit of Sean Kaiser when she entered Plaintiff's home on the subject date;
>
> e. in finding that Defendant Cure argued she is entitled to qualified immunity for the entry into Plaintiff's home because a reasonable officer would have believed she was entitled to enter the home to continue a Terry stop of Kaiser;
>
> f. in holding that the unpublished opinion in Rivera v. Washington, 57 F.App'x 558 (4th Cir. 2003) forecloses any argument that Defendant Cure's entry into Plaintiff's home was in violation of the Fourth Amendment; and
>
> g. in finding that Defendant Cure is entitled to qualified immunity for Plaintiff's allegations that the actions taken by Defendant Ashley Cure on the subject date were in violation of Plaintiff's clearly established constitutional rights under the Fourth Amendment.

(DE 48, pp. 20-21.) This Court disagrees. The Report ably and comprehensively addresses Maros' Fourth Amendment claim but, as noted above, concludes a different outcome. To begin with, as stated in the Report,

> The Fourth Amendment provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' U.S. Const. amend. IV. 'It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (internal quotation marks omitted). The central requirement of the Fourth Amendment is reasonableness, and warrantless entries into a residence are presumptively unreasonable.[] Payton v. New York, 445 U.S. 573, 586 (1980). However, 'the warrant requirement is subject to certain exceptions.' Brigham City v. Stuart, 547 U.S. 398, 403 (2006).

(DE 47, p. 12.) On the other hand, qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct does not "violate clearly established rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457

9

U.S. 800, 818 (1982). Thus, qualified immunity does not protect an official who violates a constitutional or statutory right of a plaintiff that was clearly established at the time of the alleged violation such that an objectively reasonable official in the official's position would have known of the right. See id. Further, qualified immunity is "an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

> Entitlement to qualified immunity must be analyzed in two steps, which are to be 'considered in proper sequence.' Saucier v. Katz, 533 U.S. 194, 200, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001). As a 'threshold question,' a court must ask whether, 'taken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the *officer's conduct violated a constitutional right.*' Id. at 201. If the answer is no, then the analysis ends; the plaintiff cannot prevail. Id. If the answer is yes, then 'the next, sequential step is to ask whether the right was clearly established' at the time of the events at issue.

Rivera v. Washington, 57 F. App'x 558, 561-62 (4th Cir. 2003) (emphasis added). That said, Maros disregards the ongoing Terry stop and Cure's lawful command to Kaiser and argues that a lack of exigent circumstances controls the extent to which Cure's constitutional authority to detain Kaiser within the curtilage of Maro's home and when he reentered Maros' home during the Terry stop. (See DE 41, p. 16) ("Without a valid exigency, Defendant Cure's seizure of Kaiser within the curtilage of his home is in violation of the Fourth Amendment.") However, "[t]he Supreme Court in United States v. Santana, 427 U.S. 38 (1976) recognized that a defendant could not thwart an otherwise valid arrest by retreating from the doorway of her home into the vestibule of her house. The Santana principle has sensibly been extended to Terry stops." Harbin v. Alexandria, 712 F. Supp. 67, 71-72 (E.D. Va. 1989), aff'd, 908 F.2d 967 (4th Cir. 1990). That said, the facts alleged by Maros do not demonstrate that Cure "violated [her] constitutional right against an

unlawful entry because courts have recognized that a person cannot avoid a Terry stop simply by retreating into a home." Rivera v. Washington, 57 F. App'x 558, 562 (4th Cir. 2003).[5]

As for Plaintiff's deliberate indifference objection, Maros challenges the Report's analysis of her Fourteenth Amendment claim under an intent to harm standard and solely in response to Kaiser's assault. The Report ably and comprehensively addresses this objection given this Court's ruling on her Fourth Amendment objection because Maros cannot bootstrap her Fourth Amendment objection to establish a Fourteenth Amendment error. To begin with, the Report correctly notes that:

> The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The substantive component of the Due Process Clause bars certain government actions regardless of the fairness of the procedures used to implement them." *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990) (alteration and internal quotation marks omitted). "To prove a violation of substantive-due-process rights under the Fourteenth Amendment, a plaintiff must show that a defendant's behavior was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Washington v. Housing Auth. of the City of Columbia*, 58 F.4th 170, 177 (4th Cir. 2023) (internal quotation marks omitted). The question of what sort of conduct violates that standard is one that is central to this case. The Supreme Court has explained that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). "It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* The Fourth Circuit has noted, however, that "conduct falling in between those two poles—deliberate indifference conduct which is more than negligence but less than intentional harm—presents a closer call." *Washington*, 58 F.4th at 178.

---

[5] The Court notes that Plaintiff takes exception to the Report's reliance on Rivera v. Washington, a Fourth Circuit unpublished opinion. At any rate, Rivera cites other Fourth Circuit authority which affirmed a district court opinion for the proposition that a "defendant could not thwart an otherwise valid arrest by retreating from the doorway of her home into the vestibule of her house" "has sensibly been extended to Terry stops." Harbin v. Alexandria, 712 F. Supp. at 71-72. Therefore, this argument is rejected. Furthermore, aside from this added reason for summary judgment, this Court otherwise adopts the Report's reasoning for granting summary judgment on the second prong of the qualified immunity analysis.

(DE 47, p. 20.) "[T]he intent-to-harm standard most clearly applies 'in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation.'" Dean v. McKinney, 976 F.3d 407, 414 (4th Cir. 2020). On the other hand, "[a]long the culpability spectrum, deliberate indifference is 'an intermediate level of culpability' that can, if proven, also establish a due process violation." Dean v. McKinney, 976 F.3d at 415. "But unlike the intent-to-harm standard, this standard 'is sensibly employed only when actual deliberation is practical.'" Id.

> [L]iability for deliberate indifference . . . rests upon the luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.

Id. Although Cure's actions related to the initial Terry stop were non-emergent, the events after that rapidly evolved and were fluid and dangerous. The Report correctly notes that:

> based on the context and circumstances of this case, the intent-to-harm standard applies. Cure's actions forming the basis of Plaintiff's claim were actions taken in response to Kaiser's assault of Cure in which he pushed her down on her back, held her arms, refused to let go of her, and yelled that he was stronger than she was and he could "f***ing do whatever he f***ing want[ed]." Under assault, Cure had no time to deliberate or make an unhurried judgment. When she was able to fight Kaiser off, she immediately drew her weapon in an attempt to protect herself against further attack and gain control of the situation. And when Kaiser charged toward Cure once again only seconds later, Cure was forced to make another split-second decision.

(DE 47, p. 21 (internal citations omitted).) Accordingly, Plaintiff's objection is overruled.[6]

Accordingly, after a thorough review of the Report and Recommendation and the record, the Court adopts the Report (DE 47) as modified and incorporates it here.

---

[6] Considering the Court's rulings on objections one, three, and four, the Court otherwise overrules Plaintiff's remaining objections because they are subsumed in the rulings addressed herein.

It is, therefore, **ORDERED** that Defendants' Motions for Summary Judgment (DE 39, 40) are granted and Plaintiff's case is dismissed.

**IT IS SO ORDERED**.

_____
Joseph Dawson, III
United States District Judge

Florence, South Carolina
March 15, 2024

# NOTICE OF RIGHT TO APPEAL

Plaintiff is hereby notified that she has the right to appeal this order within thirty (30) days from this date under Rules 3 and 4 of the Federal Rules of Appellate Procedure.